# COUNTY OF LINCOLN.

————O————

FIRST PARISH IN BOOTHBAY *versus* ISAAC WYLIE AND ALS.

While a town constitutes but one parish it may administer its municipal and parochial affairs under one organization, and while acting in this double capacity may appropriate any of its property to objects of a parochial or municipal character; which, after the dissolution of that union, by the constitution of a new parish, cannot be changed by one alone.

Such appropriation, when distinctly made, is equivalent to a grant of the property to a specific use.

And where no such appropriation is made of the whole estate the residue belongs to the town, and the parish can have title to no more than has been appropriated to their use.

This is an action of trespass *quare clausum*, and comes forward on REPORT of the evidence for the decision of the full court.   The *locus* described in the writ contains between eight and nine acres of land in Boothbay, title to which the plaintiffs claim to have acquired by appropriation for parochial purposes, by votes of said town, and user by them for more than twenty years.   The trespass alleged is the digging of a foundation and erection of a meeting-house by the defendants, who justify as servants of the Freewill Baptist society, under a license from the town of Boothbay.   The evidence material to the issue is fully recited in the opinion of the court.

*H. Ingalls*, counsel for plaintiffs.

*W. Hubbard*, counsel for defendants.

TENNEY, C. J.   From the evidence in the case, it appears that prior to the year 1768, a Congregational meeting-house

was erected in Boothbay, when the town consisted of one parish only; and that the two corporations so existed till a Baptist society was incorporated in the town, on February 23, 1809.

By the statute of Massachusetts, passed in 1786, chap. 10, sec. 4, the remaining part of the town became the principal or first parish, and the estate of the town consisting in lands appropriated to the benefit of the parish or religious society, by whatever description incorporated, remained with the residue of the original parish or society, and was not in any manner transferred or distributed by the separation. Brown v. Porter, 10 Mass, 93; First Parish in Brunswick v. Dunning and al., 7 Mass., 445. A poll parish has been held to be within the provision of this statute. First Parish in Sutton v. Cole, 8 Mass., 96. Property held by the town in its municipal capacity, remains still that of the town after the separation of the parish. Lahin v. Ames and al., 10 Cush., 198. The constitution of this state, in art. 10, sec. 3, provides, that all laws now in force in this state, and not repugnant to the constitution, shall remain and be in force, until altered or repealed by the legislature. No repeal has ever been made of the statute of 1786, referred to, and it is in force. Richardson v. Brown, 6 Greenl., 355.

From certain town records, and certificates of surveys made and recorded upon the town books of Boothbay, to be referred to, it appears that the town, at an early day in its corporate existence, claimed to be the owner of a tract of land in the town, of nearly one hundred acres, upon a part of which the meeting-house aforesaid was situated. The origin of this claim is not shown by any evidence in the case, and may not be susceptible of proof; but it not being denied to have been made originally by the town, and being accompanied by undisturbed possession till the incorporation of the Baptist society, a legal presumption of a grant in fee simple co-extensive with the claim and possession, arises, and is sustained by well settled principles of law.

In the year 1767, the records of the town of Boothbay

show, that the selectmen were chosen a committee to build a pound and make stocks. In the year 1768, the selectmen were chosen a committee to lay out a ministerial lot and burying ground.

It appears from the certificate of Thomas Boyd, as sworn surveyor of the court, as recorded in the town books, that on March 30, 1768, a lot of land was surveyed for Rev. Mr. John Murray, to the westward and north west of Boothbay meeting-house, bounded, &c., containing ninety-five acres and one hundred and twenty-five poles; and a plan of the land surveyed was annexed to the certificate, and recorded therewith.

On April 2, 1788, Robert Randall, sworn surveyor of land, as appears from his recorded certificate upon the books of the town, including a plan surveyed for the town of Boothbay, a lot of land lying therein, called the meeting-house or common lot, bounded, &c., containing eleven acres and thirty-two poles. Upon this lot was situated the meeting-house before mentioned, and northerly thereof was and still is, a grave yard, and near the north eastern corner of the lot surveyed by Randall was built about the year 1796 a parsonage house. South of the meeting-house and near thereto, running east and west, was a road; and from it in a southerly direction upon the same lot were two other roads, one of which was called the old road, and was easterly of the other. The lot surveyed by Randall was a part of the tract surveyed by Boyd for Rev. Mr. John Murray, and was called the "meeting-house lot," "the common," and "the town's commons" upon the records of the town, in votes appertaining thereto, but more recently these terms have been often restricted to the portion lying south of the east and west road.

The acts complained of as the trespass in this suit were upon the ground where the Baptist meeting-house was afterwards erected, and near the western side of the common, and at a considerable distance south of the east and west road, and a part of the lot surveyed by Randall.

Prior to the year 1809, the town voted at different times to rebuild the pound, to fence the grave-yard, and to repair the fence of the same; to repair the meeting-house, and to allow individuals to build horse-sheds upon the lot north of the meeting-house, within certain prescribed limits.   In the year 1787 the town voted, that one Patrick Herrin have a lease of the commons, except the grave-yard, highways and training field, for three years, on condition the lessee should pay to the town one bushel of potatoes a year, if demanded. The surveyors of highways, from time to time, before the year 1809, took materials from the common, to repair roads.

It is in evidence, that a part of the commons were prepared for a military parade, by permission of the town, previous to the time when the town and the parish were separated.   This parade was on a part of the common near to the east and west road, and on the south side thereof in front of the meeting-house.   Military duty was done on this parade and in the road contiguous; and on one occasion a battalion paraded upon the common.   In the year 1798, it was " voted that the commons be enclosed, leaving the whole pound on the parade."

Of the tract of land surveyed for Rev. Mr. John Murray, in March, 1768, it is in evidence, that the portion near the parsonage house was sometimes called the land " near, adjoining the ministerial house," and is understood to be north of the east and west road; and " the ministerial lot," which is not a part of the parcel surveyed by Randall.   The proof in the case is, that the latter has always been treated as parish property.

In the year 1796, the town voted Rev. Peletiah Chapin, as ministerial settlement, in the town, the use of a convenient dwelling-house, and the use and improvement of the land known by the name of the ministerial lot, and of about six acres of the meeting-house lot, so called, during said Mr. Chapin's ministry in said town.   It does not appear that Mr. Chapin accepted the invitation, for in 1797, at a legal meeting of the inhabitants of Boothbay, holden on November 20,

it was voted, the Rev. John Sawyer as ministerial settlement in this town, a dwelling-house, known by the name of the ministerial house, and the improvements of all the land known by the name of the ministerial lot, and also about six acres of the meeting-house lot, so called, during the time the said Rev. John Sawyer shall continue in the work of the ministry in said town.

After the year 1809, when the Baptist society was incorporated, the town continued to pass votes as such for several years, touching the settlement and support of ministers, the repair of the meeting-house, grave-yard fence, &c. This may have been from an erroneous opinion of their rights and duties. But from the year 1816, it appears that such matters were transacted by the parish, and that records of their doings were kept distinct from those of the town.

In the year 1847, a town-house was erected upon the commons, south of the east and west road, at the expense of the whole town, under a corporate vote, and the same has been occupied as a town-house to the present time.

The defendants justify the acts complained of under an authority of the town of Boothbay; and it is admitted by the plaintiffs that if the town had the power to grant the license alleged, the acts were not illegal as against them.

While the town of Boothbay constituted but one parish, it administered its municipal and parochial concerns under one organization, and sometimes the same votes embraced matters pertaining to both; for example, to repair the meeting-house, and to do other things clearly of a municipal character. And during this entire period, it does not appear that the town ever had any meeting, or passed any vote, as a parish *eo nomene.* It was competent for the inhabitants to transact their business as town and parish in this united mode, and it is not contended by either party, that any adverse enjoyment by one corporation could ripen into any rights against the other. While acting in this double capacity, the town could appropriate by vote any of its property to objects of a parochial or municipal character, and at pleas-

ure withdraw or modify that appropriation. When the two corporations were disunited, their respective rights could not be changed by one alone. In the language of the court, in Lahin v. Ames, 10 Cush., 198, "an appropriation to a municipal or parochial use during the union, would determine whether it was town or parochial property, at the time of the formation of a new parish, and the consequent separation of the town and the original parish into two distinct corporations. Such appropriation, when distinctly made, would be equivalent to a grant of the property to a specific use. It might be made as it usually was in such cases, by a vote of the united corporations, which, if *in force* at the time of the separation, would be decisive of the title to the property so appropriated, or it might be shown by the erection of structures of a permanent character made during the union, and so long continued, as to indicate clearly the dedication of the land to some particular purpose. If, for instance, a town-house or school-house were thus built, it would be an appropriation of the land on which they stood with that which was appurtenant and necessary for its enjoyment, to the town; but the erection of a meeting-house, a vestry or horse sheds near the meeting-house, would be an appropriation of the land, &c., to purposes exclusively parochial."

In this case no appropriation of the land embracing the *locus in quo* was made by the town for the use of the ministry generally; nor had the land been purchased by the town for its use, as a perpetual parsonage; and hence it does not fall within the provisions of the provincial statute of 28 Geo., 2, and the statutes of Massachusetts Bay of 1786, chap. 51, which was an enactment thereof, on which rest the right of ministers to hold parsonage lands in succession, as sole corporations; and whose rights and remedies are clearly defined by the common law, they standing on the same foundation, as to their parsonages, with all other sole corporations, holding lands in succession at common law. Ministers hold parsonage lands in fee simple in right of their parishes or churches. On their resignation or death the fee is in

abeyance till there be successors, the parishes or churches, during the vacancy, having the custody, and are entitled to the profits of the parsonage. Weston v. Hunt, 2 Mass., 500; First Parish in Brunswick v. Dunning, 7 Mass., 445 ; Brown v. Porter, 10 Mass., 93. But this case, in relation to the question whether the fee of the land in controversy is not in the minister, to hold in succession, bears a resemblance to that of Emerson v. Wyley, 10 Pick, 319. The right of the minister to hold as a sole corporation was denied in that case.

The town of Boothbay at no time set apart the land, on which the Baptist meeting-house stands, to the use of the ministry, in the true sense of the statute of 1786, chap. 51, but allowed Mr. Sawyer to occupy it during his ministry in the town, clearly retaining the power to make any other appropriation, after the contract with him personally should be fulfilled.

It does not appear in the case that Mr. Murray was settled as the minister in Boothbay, or that he became entitled to the land, in fee or otherwise, surveyed by Mr. Boyd. Neither of the parties before us make any claim under an appropriation to him. Certain appropriations made of parts of the lot surveyed by Randall were for uses not of a parochial character; such as the grave-yard, notwithstanding the parish, after the year 1809, treated it, by certain votes, as being under their supervision ; the sites for pounds were set apart for a use clearly municipal. The right of the militia of the town to use portions of the lot for a training field was conferred by the town in its municipal capacity. But the erection of a meeting-house, and keeping it in repair, the building of the parsonage house, and the permission given to certain persons to erect horse-sheds, were acts of a parochial nature. But after taking from the lot the land of these several appropriations, including all which was necessary for the use of the same as incident thereto, a large portion of the entire lot still remained. This could be used for other objects and not interfere in any manner with the use of the parts so designated.

This case is not analagous to one where the town and parish in their united capacity purchase land on which to build a meeting-house, and the land so purchased is greater in extent than is necessary, or is actually used in connection with the building. In the latter, by the very terms used, the whole lot is parish property, and not designed for a different object. It will so continue till the town in the same capacity change the intention first entertained. First Parish in Medford v. Medford, 21 Pick., 199. In the case under consideration, when the lot was surveyed by Randall for the town of Boothbay, the meeting-house and parsonage-house were standing thereon, and the grave-yard had long been used for purposes of sepulture. Nothing in the case indicates that there was not a sufficiency of land connected with all these for the convenient use thereof. These were all separated from the residue of the lot by a road, and the southern portion is not satisfactorily shown to have been at that time designed for parochial use. It is true that the surveyors' certificate states the whole lot conveyed " is called the meeting-house or common lot." This may have been designed as merely indicative of its location, in reference to the meeting-house, which stood upon it. It is certainly insufficient proof, without other facts, that it was set apart for parish use exclusively. The pound was upon this portion of the lot, and was allowed to continue thereon, by vote of the town, after Randall's survey. Parts were used as a military parade afterwards, as before, without any interference on the part of the town, showing that there was no express design to change the previous appropriation.

It having been settled by the application of common law principles, as well as by a proper construction of the statute of 1786, chap. 10, sec. 4, in the case of Brown v. Porter, already cited, that the estate in lands, appropriated to the benefit of a parish or religious society, remains with the residue of the parish, it is certainly implied that without that appropriation the estate is held by the town, after the separation. Indeed this proposition, thus implied, is so obvi-

ously true of itself, that it seems to need no argument in its support. If a town, being also a parish, becomes the owner of a parcel of real estate, without anything to indicate its present or future use, before a separation of the two corporations, by the formation of a parish therein, upon the happening of that event, it cannot be doubted that the town, and not the residue of the parish, will continue to hold the title.

We now come to the votes upon which the plaintiffs rely, to show that upon the separation of the town and parish, on February 23, 1809, the land embracing the *locus in quo*, was appropriated to a parochial object. It not appearing that Mr. Chapin was ever settled in the town of Boothbay, the only vote deemed important upon this point, is that which was passed prior to the settlement of Mr. Sawyer. He commenced preaching there in October, 1797, and went to New Hampshire, and remained a short time, and returned in March, 1798; and it appears that he then entered upon his professional duties, and continued to exercise them in connection with the people of his charge in Boothbay for about eight years. The case furnishes no evidence that any other succeeded him, till after the separation of the town and parish. But it does appear that I. P. Fisher came to Boothbay in the year 1808, and was installed in June, 1809, over the people of the first parish in Boothbay. In May of that year, the town voted his salary and the use of certain lands. The vote passed by the town, after the separation, in relation to the settlement of the minister, are not deemed important to the questions in controversy.

The relation between Mr. Sawyer and his people terminated several years before the town and parish became different and distinct corporations. At the time of the dissolution of this relation, the vote of 1797, giving him the use of " six acres of the meeting-house lot, so called," during the time he should " continue in the work of the ministry of said town," had fully discharged its office, and could have afterwards of itself no greater effect than such a vote for a single year

would have.   This vote was not in force at the time the town and parish were disunited.   This appropriation by the town had ceased, and the condition of the land in respect to its use, as it was, immediately before the vote, was restored.   If, at the time of the separation, Mr. Sawyer had been in the active discharge of his contract under the vote, this would be decisive, that the land was appropriated to parish uses, and the title afterwards would be fixed in the plaintiffs beyond the power of revocation by the town.   But the fact that it was voted to the minister in part payment of his salary so long as he continued in the work of his profession in Boothbay, could not impress upon it a parochial character after he ceased to perform that work entirely, when the connection between town and parish continued.

Do the facts in the case show that the plaintiffs have obtained a title to the land, on which they allege the trespass to have been committed, by a disseizin of the town, continued without being purged, for the term of twenty years prior to the commencement of this suit?

Upon a careful examination of the records introduced, bearing upon this point, and of all the evidence reported in the case, it is not proved that the plaintiffs have had such an open, notorious, adverse, and exclusive possession of the land in controversy, as would constitute a title by disseizin.   And the title having been originally in the town of Boothbay, and this title having so continued, till the institution of this suit, the defendants were justified in the acts, under its license to perform them.

*Plaintiffs nonsuit.*